**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 10, 2012

Lyle W. Cayce
Clerk

No. 11-20025

DARIN DUNCAN,

Plaintiff-Appellant,

versus

UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
No. 4:09-CV-715

Before SMITH, GARZA, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Darin Duncan brought claims alleging that his dismissal from medical school was the result of unlawful disability discrimination. He asserted several

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-20025

constitutional violations and state tort and contract claims.  Except for a claim under the Rehabilitation Act of 1973 (the "RA"), all of Duncan's causes of action were dismissed as barred by state sovereign immunity.  Summary judgment was later granted in favor of the medical school on the RA claim.  We affirm.

I.

Candidates for the degree of Medical Doctor at University of Texas Health Science Center at Houston ("UTHealth") must complete a four-year program. According to UTHealth's written admissions criteria, students must be able to tolerate physically taxing workloads and to function effectively under stress.  In addition to studying subjects such as neuroscience and immunology, students must complete service rotations that test their clinical judgment and practical skills.

UTHealth also evaluates students more generally for their suitability for the practice of medicine, including noncognitive skills such as interpersonal relations.  Student suitability is gauged by a rotating group of twenty-three faculty members, called the Student Evaluation and Promotion Committee ("SEPC"), which evaluates students throughout their tenure at the school and decides whether to promote them to subsequent years of study.

Duncan first entered UTHealth in August 2004.  Within months, allegations arose that he was harassing a female student.  At that time, he was counseled and reminded about the professionalism and suitability provisions; administrators warned him that future incidents would be referred to the SEPC. Approximately a year later, Duncan distributed an advance copy of a column he had written for an online medical website.  A fellow student believed its contents were racially disparaging.  A UTHealth administrator facilitated a resolution

No. 11-20025

between Duncan and the offended student.  Duncan was again spared a referral to the SEPC.

In 2006, Duncan failed his Physical Diagnosis course because he neglected to complete his preceptorship.[1]  Although that course was a prerequisite to advancement to the third year, Duncan registered and began his third-year Neurology rotation without consulting with any faculty regarding the course failure.  After being instructed to withdraw from Neurology, Duncan attempted to complete Physical Diagnosis by asking a physician who had never observed Duncan's clinical activities to sign off on his preceptor forms.  That physician reported the irregularity to the SEPC.  Citing suitability concerns and the failing grade, the SEPC dismissed Duncan from UTHealth.

Duncan was permitted to reenter UTHealth for the Spring 2007 semester. He remediated his Physical Diagnosis course and appropriately began third-year work.  Within a short time, he again found himself before the SEPC for attempting to sit for a final exam prematurely.  He admitted to exercising poor judgment and, according to the meeting minutes, said he had done it in order to "fit in with other[] students."  In June 2008, Duncan received a marginal grade in his Cardiology elective and once again was called before the SEPC.  At this third appearance, the committee decided to dismiss him permanently from UTHealth.

Duncan sued UTHealth claiming violations of Section 504 of the RA and Title II of the Americans with Disabilities Act ("ADA").  He further claimed violations of due process and the First Amendment via 42 U.S.C. § 1983.  He brought state-law claims for mental anguish and breach of contract.

---

[1] A preceptorship is a period of practical experience and training under the supervision of an expert.

No. 11-20025

The district court dismissed in part, holding that except for the claim under the RA, state sovereign immunity deprived the court of jurisdiction over Duncan's claims.  After discovery, the court entered summary judgment for UTHealth on the remaining claim.  Duncan appeals.

## II.

We review *de novo* a Rule 12(b)(1) dismissal based on sovereign immunity. *Meyers ex rel. Benning v. Texas*, 410 F.3d 236, 240 (5th Cir. 2005).  We consider the plaintiff's allegations as true; our "review is limited to determining whether the district court's application of the law is correct." *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009) (internal quotation marks omitted).

Our review of a summary judgment is also *de novo*. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010).  Summary judgment is proper where there is "no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). Like the trial court, we consider all evidence and draw all inferences in the manner most favorable to the non-movant. *Holt*, 627 F.3d at 191.  "Even if we do not agree with the reasons given by the district court to support summary judgment, we may affirm the district court's ruling on any grounds supported by the record." *Lifecare Hosps., Inc. v. Health Plus of La., Inc.*, 418 F.3d 436, 439 (5th Cir. 2005).

## III.

The Eleventh Amendment declares there is no "Judicial power of the United States" over a suit "against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  Despite the limited categories of suits barred by the Amendment's

literal language, the Supreme Court has long interpreted the Amendment as expressive of the broader proposition that a state has immunity from suits brought by her own citizens as well as by those of another state. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). As a public university, UTHealth enjoys the state's sovereign immunity.[2]

Thus, Duncan, though a Texas resident, cannot bring any of his claims against UTHealth unless he fits them within one of three recognized exceptions to sovereign immunity: suits seek injunctive or declaratory relief against state officials under *Ex parte Young*, 209 U.S. 123 (1908); a state's waiver of immunity, *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267 (1997); or Congress's abrogation of state immunity via Section 5 of the Fourteenth Amendment, *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001).

Although Duncan requests injunctive relief, the *Ex parte Young* exception requires a plaintiff to name state officials as defendants in their official capacities. *Kentucky v. Graham*, 473 U.S. 159. 169 n.18 (1985). Duncan sued only UTHealth. No exception applies to his § 1983 claims, because there has been no abrogation by Congress, *see Quern v. Jordan*, 440 U.S. 332, 345 (1979), nor waiver by the State of Texas, *Aguilar v. Tex. Dep't of Crim. Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). Duncan's state law actions are also barred by Texas's sovereign immunity.[3]

The district court thus properly dismissed all the foregoing claims. The court also properly refused to hold that sovereign immunity bars Duncan's claim

---

[2] *See, e.g.*, *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 320 (5th Cir. 2008); *United States ex rel. Foulds v. Tex. Tech Univ.*, 171 F.3d 279, 289 n.14 (5th Cir. 1999).

[3] *See Kitchens v. Tex. Dep't of Human Res.*, 747 F.2d 985, 986 (5th Cir. 1984) (contract claims); *Sherwinski v. Peterson*, 98 F.3d 849, 852 (5th Cir. 1996) (tort claims).

No. 11-20025

under the RA. By accepting federal financial assistance, Texas waived sovereign immunity for discrimination suits under Section 504. *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 345 (5th Cir. 2005) (en banc).

We now examine sovereign immunity as to Title II of the ADA. Because the ADA's application to UTHealth is not linked to the provision of federal funding, there was no waiver of immunity. *See Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 276 n.4, 291 (5th Cir. 2005) (en banc). Sovereign immunity thus bars Title II claims against the medical school unless Congress has validly abrogated that immunity under its power to enforce the Constitution's substantive guarantees through the Fourteenth Amendment.

Determining whether sovereign immunity has been abrogated as to a particular Title II claim hinges on three inquiries. First, the court must consider "which aspects of the State's alleged conduct violated Title II." *United States v. Georgia*, 546 U.S. 151, 159 (2006). Next, the court must determine "to what extent such misconduct also violated the Fourteenth Amendment." *Id.* If the alleged conduct violates both a constitutional guarantee and Title II, then there is no immunity, but if the conduct offends neither Title II nor the Constitution, then the suit must fail. If "the State's conduct violated Title II but did not violate the Fourteenth Amendment," however, the court must make a third inquiry to determine 'whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.'"[4] *Hale v. King*, 642 F.3d 492,

---

[4] When used in this context, the reference to the Fourteenth Amendment includes all the incorporated provisions of the Bill of Rights. For example, *Georgia* pertained to Eighth Amendment claims against a state prison. *Georgia*, 546 U.S. at 157, 159; *see also McDonald v. City of Chicago*, 130 S.Ct. 3020, 3035 (2010) (stating that Bill of Rights protections are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment").

498 (5th Cir. 2011) (interpreting *Georgia*). The third test arises from the principle that Congress's power under the Fourteenth Amendment includes authority to prohibit conduct that is not itself unconstitutional but that Congress determines should be barred by one of its enactments "both to remedy and to deter violation of rights guaranteed" by the Amendment. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000). Because Title II *might* still abrogate sovereign immunity for violations that fall short of a constitutional violation, the courts must always assess the underlying merits of the cause of action. *Hale*, 642 F.3d at 498.

The district court did not offer reasons for its dismissal other than to state that UTHealth's motion was "well founded." That motion had argued that as to the ADA, the "State's immunity is abrogated only for conduct that also constitutes a violation of the Constitution." As *Hale* informs, that is incorrect. We do not conclude, however, that the district court erred in granting the motion. We explain in our summary-judgment analysis below that there is no genuine issue as to Duncan's disability under the RA. Because the statutory definitions of disability are identical in the ADA and the RA, Duncan likewise cannot survive summary judgment as to the ADA. *See* 29 U.S.C. § 705(9)(B); *Pace*, 403 F.3d at 287-88 & n.76.

Duncan had a reasonable opportunity to present evidence relevant to disability under both statutes. Therefore, it is unnecessary to address whether the district court's conclusion about UTHealth's immunity from suit under the ADA should have awaited summary judgment.

IV.

The RA protects individuals from exclusion from schools receiving federal funds, such as UTHealth, based on their disability. 29 U.S.C. § 794. To estab-

No. 11-20025

lish a *prima facie* case of discrimination under the RA, a plaintiff must show that he was (1) disabled within the meaning of the RA, (2) subjected to an adverse action "solely by reason of her or his disability," and (3) otherwise qualified for the program.[5]

Without dispute by either side, we apply here the familiar burden-shifting formula from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to claims brought under the RA.[6] If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for its actions. *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995). To satisfy its burden of production, the defendant need only produce "any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Our analysis begins and ends at the first stage. Duncan's *prima facie* case fails for lack of a qualifying disability. Accordingly, no burden of production shifts to UTHealth.

To come within the coverage of the RA, a person must have a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). These are activities such as "hearing, speaking, breath-

---

[5] *See Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 504-05 & n.7 (5th Cir. 2002) (emphasis omitted); *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000).

[6] In earlier unpublished opinions, we determined that the great majority of other circuits have explicitly applied *McDonnell Douglas* to claims under the RA. *E.g.*, *Handy v. Brownlee*, 118 F. App'x 850, 854 & n.3 (5th Cir. 2004) (per curiam) (collecting cases from nine circuit courts of appeals). Lending further support to this approach is this circuit's holding that caselaw interpreting the ADA and Rehabilitation Act can generally be used interchangeably. *See Pace*, 403 F.3d at 287-88 & n.76.

ing, learning and working." *McInnis*, 207 F.3d at 280.  The Supreme Court has interpreted this term strictly "to create a demanding standard to qualifying as disabled." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).[7] Congress has directed that we engage in a case-by-case analysis. *See id.* at 198. Thus, whether a plaintiff has a disability under the RA "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Id.* at 198.

Duncan claims that major depression substantially limits his ability to "learn" and "work" at medical school.  A psychiatrist has opined that Duncan's symptoms began near the close of the first year of medical school and lasted into the second.  He identified Duncan's symptoms as "depressed mood, diminished interest in daily activities, [and] weight loss" as well as "insomnia, and decreased attention and concentration."  These symptoms also were said to affect "memory and [to have] negatively impacted the ability to work at medical school clinics and learn including at medical school classes and to lose interest in both."[8]

Duncan has also claimed, however, that treatment would have made him qualified for medical school. Taken as correct, that assertion disproves his claim

---

[7] Congress has amended the ADA and RA to ease the plaintiff's burden from that recognized in *Williams* and *Sutton v. United Air Lines*, 527 U.S. 471 (1999).  ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.  The incidents in this lawsuit predate the January 1, 2009, effective date of those amendments, and the changes were not retroactive. *See Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 857 (5th Cir. 2010).

[8] On appeal, Duncan cites only these two major life activities.  The district court separately considered whether Duncan could show substantial impairment as to "his ability to get along with others."  Without deciding whether that constitutes a major life activity, we agree that such an argument fails, because Duncan's psychiatrist did not so much as intimate that conflict with others (*i.e.*, the harassment allegations or purportedly insensitive Internet column) was a symptom of Duncan's depression. Tellingly, in his response to summary judgment Duncan characterized those problems as "not severe."

No. 11-20025

of a qualifying disability. Disability must be viewed in the light of available treatment and corrective measures. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 488-89 (1999). Because Duncan himself argues there were available treatments, he did not have a qualifying disability.[9]

Duncan failed to establish a genuine issue of fact as to a qualifying disability. That failure meant that his claims under the RA and the ADA were properly dismissed, in addition to those barred by sovereign immunity.

AFFIRMED.

---

[9] *See Carmona*, 604 F.3d at 855 ("In *Sutton*, the Court held that the mitigating effects of medication had to be taken into account in determining whether or not a person was 'substantially limited' in performing a major life activity.").